# CONTINUATION

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of two cellular phones described in Attachment A, which are currently in law enforcement's possession, and the extraction from the cellular phones of electronically stored information described in Attachment B.

2. I, Special Agent Gregory Pond, was a Police Officer for five years prior to being hired by the Drug Enforcement Administration (DEA) as a Special Agent. I have been employed by the DEA for 16 years. I have worked in St. Louis, Missouri, Afghanistan, and Kalamazoo, Michigan conducting investigations of illegal drug trafficking involving international and interstate drug trafficking organizations and possession of firearms by convicted felons. I have received specialized drug trafficking training beginning with the DEA Training Academy and including continuous in-service training during my career with the DEA. I have participated in hundreds of investigations and served as an Affiant for multiple federal search warrant affidavits.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4. The devices (hereinafter "Devices" or "two cellular phones") to be examined are: 1) a black, Samsung S10, IMEI 351924104360173 and 2) a black Samsung cellular phone, IMEI 354807093090454. The Devices are currently in the possession of the Michigan State Police Southwest Enforcement Team in Centreville, Michigan and are fully described in Attachment A.

## PROBABLE CAUSE

5. On July 15, 2021, Michigan Department of Corrections (MDOC) Absconder Recovery Unit (ARU) and Three Rivers Police Department (TRPD) investigators contacted Shane Lee HENDERSON in a light colored GMC Yukon bearing Michigan registration EHT 8295. HENDERSON was sitting in the GMC Yukon, parked behind the Little Caesars Pizza, 129 N. Main Street, Three Rivers, Michigan. The purpose was to arrest HENDERSON for an outstanding warrant for Failure to Appear in the 45th Circuit Court, St. Joseph County, Michigan and a MDOC parole violation warrant. At the time of his arrest, HENDERSON was on parole for a conviction in the 43rd Circuit Court, Cass County, Michigan, for possession of methamphetamine and habitual offender second offense. I have reviewed HENDERSON's criminal history. He has seven prior felony convictions for dangerous drugs, resisting arrest, fleeing and eluding and delivery of dangerous drugs.

6. Michigan State Police (MSP) Southwest Enforcement Team (SWET) investigators previously surveilled HENDERSON driving the Yukon to and from a residence that is under investigation for suspected drug trafficking. SWET investigators observed HENDERSON come and go from the residence approximately 3 times over a period of two weeks driving the Yukon. SWET investigators obtained information that the Yukon was provided to HENDERSON by a girlfriend in Lansing, Michigan and that HENDERSON was selling drugs behind the Little Caesars Pizza restaurant in Three Rivers, Michigan while HENDERSON was working at Little

Caesars Pizza. Information was also obtained by ARU investigators indicating that HENDERSON may have been in possession of two firearms on July 14, 2021.

7. On July 15, 2021, ARU and TRPD investigators observed HENDERSON sitting in the driver's seat of the parked Yukon with the door open behind the Little Caesars Pizza restaurant. No one else was present in the Yukon. As ARU and TRPD investigators approached HENDERSON, HENDERSON exited the Yukon and was arrested with the ignition key to the Yukon in his hand.

8. A subsequent search of the Yukon revealed a box for a digital scale and a methamphetamine smoking device located near the center console of the vehicle. A false bottom in the center console was discovered, concealing a black box with attached magnets wrapped in a black sock. Investigators opened the box and seized several bags of suspected methamphetamine from inside the box.

9. A further search located a "Johnny's" shopping bag inside a speaker box in the back hatch area of the Yukon. More suspected crystal methamphetamine, fentanyl, cocaine, a digital scale and a suspected methamphetamine pipe were located inside the "Johnny's" shopping bag. U.S. Mail addressed to "Shane Henderson" was located in the back hatch area near the speaker box. Field tests using a TRU NARC instrument were conducted on the suspected methamphetamine and cocaine. Results indicated the presence of methamphetamine and cocaine. A MobileDetect field test was conducted on the suspected fentanyl and the results indicated the presence of heroin/fentanyl. The methamphetamine was wrapped in eleven individual baggies and had a gross weight, including packaging, of 238 grams. The heroin/fentanyl weighed approximately 2 grams, including its packaging. The cocaine weighed approximately 4 grams, including its packaging. Subsequent testing by the DEA Laboratory confirmed that the substances were methamphetamine, a mixture containing heroin and fentanyl, and cocaine.

10. A TRPD police canine sniff was executed and the TRPD canine alerted to the rear seat area of the Yukon, adjacent to the speaker box that the suspected methamphetamine, fentanyl/heroin, and cocaine were seized from.

11. The Devices were seized from HENDERSON pursuant to his arrest. One cellular phone was on, unlocked and propped on the steering wheel of the Yukon. The other cellular phone was seized from the passenger compartment of the Yukon, near the driver's seat.

12. On August 12, 2021, Magistrate Judge Ray Kent of the U.S. District Court for the Western District of Michigan signed a criminal complaint alleging Shane Lee HENDERSON possessed with the intent to distribute 50 grams or more of methamphetamine and a quantity of cocaine and a quantity of heroin/fentanyl based on law enforcement's arrest of HENDERSON on July 15, 2021. HENDERSON was subsequently arrested and brought before the Court in the Western District of Michigan on August 12, 2021.

13. On September 1, 2021, HENDERSON was indicted by a Grand Jury sitting in the Western District of Michigan for possession with intent to distribute 50 grams or more of methamphetamine, a mixture containing fentanyl and heroin, and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(C).

14. Based on my experience and training, I know (a) that the quantities of methamphetamine in this investigation are consistent with drug trafficking rather than personal use, (b) that these quantities reflect an intent to distribute, and (c) that methamphetamine, fentanyl and cocaine are Schedule II controlled substances and heroin is a Schedule I controlled substance.

15. Based upon my training and experience, as well as the training and experience of others, I understand the following about drug traffickers:

    a. People engaged in drug trafficking frequently utilize cellular telephones to facilitate their transactions. Cellular telephones are portable, and many mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so narcotics traffickers often use the devices in an effort to avoid detection by law enforcement.

    b. Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls; text messages; emails, photographs of drugs, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time. Additionally, drug traffickers typically maintain and use multiple mobile phones to facilitate sales, and frequently switch phones to evade detection by law enforcement. Further, these types of devices are frequently used to access social media websites such as Facebook, Instagram, etc. Based on my training and experience, and the training and experience of other law enforcement agents, drug traffickers are using social media with increasing frequency to communicate with suppliers and purchasers of narcotics.

    c. Persons who sell drugs will often keep documents, phone numbers of other drug dealers and phone numbers of their drug sources stored within their cellular telephones.

    d. Drug traffickers often take, or cause to be taken, photographs and videos of themselves, their associates, their property and/or their drugs, often storing them on their cellular telephones.

16. HENDERSON is currently serving a term of parole, which began on October 27, 2020 and is set to run through January 27, 2022 for a 2018 conviction for possession of methamphetamine. I have reviewed HENDERSON's order of parole with the Michigan Parole Board. HENDERSON's order of parole contains the following special condition: "I voluntarily consent to a search of my person and property upon demand by a peace office or parole officer. If I do not sign this written consent, I understand that my parole may be rescinded or revoked." HENDERSON initialed this special condition, among all the other special conditions contained in his order of parole, and signed his order of parole on September 10, 2020. The parole order contained the following affirmation above HENDERSON's signature: "I have read or heard the parole conditions and special conditions and have received a copy. I understand that failure to comply with any of the conditions or special conditions may result in revocation of parole and return to confinement. I understand and agree to comply with the parole conditions and special conditions."

17. On the basis of the information contained in this continuation and my experience and training, probable cause exists to believe that evidence of drug trafficking involving Shane Lee

HENDERSON will be stored or contained in the two cellular phones described in Attachment A.

18. Based on the foregoing recitation of facts, and in light of my training and experience, as well as the training and experience of other law enforcement officers, I submit that there is probable cause to believe that the Devices listed in Attachment A contain historical information concerning call activity; information stored in the phone's "phonebook" or "contacts" directory; stored voice-mails; emails; text messages; electronic files; photographs; video images; and records of internet searches and transactions that are evidence of violations of federal controlled substance laws.

## TECHNICAL TERMS

19. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

    c. Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "Wi-Fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.  Based on my training, experience, and research I know that the Devices have

capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on cellular phones can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

20. The requested warrant would authorize the extraction and copying of electronically store information, all under Rule 41(e)(2)(B).

21. Based on my knowledge, training, and experience, I know that cellular phones can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensics tools.

22. *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23. *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not

limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

24. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

25. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.